UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 12 CR 236 (EGS) |
| | : | |
| KEELY THOMPSON | : | |

**GOVERNMENT'S ADDENDUM TO ITS
MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Addendum to the Government's Memorandum in Aid of Sentencing to provide the Court additional information relating to defendant Keely Thompson's ("Thompson") cooperation with the Government. Specifically, as required by its Plea Agreement with Thompson, this Addendum details Thompson's work as a cooperator, the government's basis for declining to file a motion on Thompson's behalf pursuant to United States Sentencing Commission, Guideline Manual (2012) (hereinafter "Sentencing Guidelines" or "U.S.S.G.") § 5K1.1, and certain sensitive, non-public information relating to the Government's investigation into a District of Columbia Councilmember ("Member A").

This Addendum is being filed under seal because it discusses allegations by Thompson that between 2004 and 2009, Thompson periodically paid kickbacks to Member A, totaling $50,000, in exchange for Member A providing grant funds to Thompson's non-profit youth boxing association, Keely's District Boxing and Youth Center, Inc. ("KDBYC"). Because the Government has been unable to substantiate or corroborate Thompson's allegations, this Addendum is being filed under seal to allow the Government to fully apprise the Court of the

nature and extent of Thompson's cooperation without unfairly damaging Member A's reputation and character.

## Introduction

Thompson was first interviewed by law enforcement in connection with this investigation in August 2010 during a non-custodial meeting. During that interview, Thompson expressly denied paying kickbacks to Member A. In January 2013, after Thompson and his wife were indicted, Thompson began cooperating with the Government and stated for the first time that he paid kickbacks to Member A. Between January 2013 and June 2013, Thompson met with law enforcement on 5 to 10 occasions, pursuant to a standard debriefing agreement. During the debriefings, Thompson explained that Member A was the primary source of funding for KDBYC, the non-profit company that administered Thompson's boxing program. Law enforcement independently confirmed that from 2004 to 2009, Member A caused approximately $1.4 million in grant funds to go to KDBYC through earmarks, District of Columbia agencies, and two non-profit companies, the Children Youth Investment Trust Corporation ("CYITC") and the Columbia Heights/Shaw Family Support Collaborative ("Collaborative").

Thompson also informed law enforcement that he did, in fact, pay kickbacks to Member A despite his earlier denial in 2010. Specifically, Thompson stated that from 2004 to 2009, he periodically paid kickbacks to Member A totaling $50,000, in exchange for Member A continuing to fund KDBYC. Thompson's allegation that he paid kickbacks to Member A is memorialized in the Statement of Offense that was executed by the parties as part of parties' plea agreement, which was filed with the Court on June 26, 2013. See Statement of Offense at 3 (identifying "[a]dditional unauthorized expenditures, totaling $50,000.").

When Thompson informed the Government about the kickbacks to Member A, law enforcement attempted to corroborate Thompson's claims. Ultimately, the information Thompson provided to law enforcement did not lead to any viable leads, arrests, or prosecutions. As a result, the Departure Committee at the United Sates Attorney's Office concluded that Thompson has not provided substantial assistance in the investigation or prosecution of another person, and therefore, the Government is not filing a motion on Thompson's behalf pursuant to U.S.S.G. §5K1.1.

The remainder of this Addendum discusses: 1) the procedural history of Thompson's cooperation; 2) the facts disclosed by Thompson during debriefings; 3) Thompson's potential proactive investigation; and 4) the Government's basis for declining to file a U.S.S.G. § 5K1.1 motion on Thompson's behalf.

I. **Procedural History**

Thompson's youth boxing organization (KDBYC) began operating in 2004 and continued operating through early 2009. By spring 2009, **[WITNESS #1]** began informing members of KDBYC's board and Member A's staff that certain financial irregularities were occurring at KDBYC. In late spring and summer 2009, Member A met with Thompson on several occasions to discuss and remedy those financial irregularities. Not satisfied with Thompson's response, in October 2009, Member A wrote a letter to the District of Columbia Office of Inspector General ("OIG"), advising that allegations against Thompson had been levied that "approximately $290,000 in government funds were misused over a period of 3 years by Keely Thompson, founder and executive director of Keely's District Boxing and Youth Center." Member A provided OIG an itemized list of the alleged improper expenditures that included $91,934 at Bally's Park Place, Atlantic City.

Based on Member A's referral, OIG and FBI began investigating Thompson for the misuse of KDBYC's grant funds. As part of that investigation, on August 10, 2010, agents conducted a non-custodial interview of Thompson. During the interview, Thompson discussed KDBYC's activities and how KDBYC's grant funds were used. While Thompson equivocated with regard to his culpability, he made several statements that indicated to the agents that further investigation was warranted. During the interview, Thompson also unequivocally denied paying kickbacks to Member A. A copy of the Memorandum of Interview memorializing Thompson's statements during the August 2010 interview is available to the Court upon request.

On November 17, 2010, Thompson was charged with wire fraud in a one count Complaint. On November 2, 2012, Thompson and his wife, Bianca Thompson, were indicted in a 31 count indictment, alleging wire fraud and related charges. On January 25, 2013, Thompson and attorney Nathan Silver ("Silver") met with the Government pursuant to a standard debriefing agreement. During that meeting, Thompson discussed paying kickbacks to Member A for the first time. In a subsequent debriefing, on February 11, 2013, Thompson admitted to using KDBYC funds to gamble in Atlantic City. Over the course of the next four months, law enforcement debriefed Thompson several more times, obtaining more details with regard to Thompson's misuse of government funds and the kickback payments Thompson stated he made to Member A.

Thompson subsequently dismissed attorney Silver as his lawyer. On or about April 30, 2013, Thompson retained attorney Troy Poole ("Poole") to represent him. On or about May 14, 2013, the government conveyed a plea offer to Thompson, which he accepted. Thompson entered his guilty plea before the Court on June 26, 2013.

## II. Facts Provided By Thompson During Debriefings

Thompson grew up and attended grade school in Washington D.C. As a teenager, he met Member A's Chief of Staff ("Person B"), who was a few years older than Thompson. As Thompson grew into his late teens and 20s, he periodically crossed paths with Person B and exchanged pleasantries. Thompson and Person B were not close friends, but they traveled in some of the same circles. Years later, Person B became Member A's Chief of Staff.

As discussed in the Government's Sentencing Memorandum, Thompson was a professional boxer in the late 1980s and early 1990s. In the early 2000s, after retiring from boxing, Thompson opened a restaurant in Washington, D.C. By that time, Person B was working on Member A's staff, and Person B brought Member A to Thompson's restaurant on several occasions. Member A ran for re-election in 2002 and asked Thompson for his support. Thompson agreed, asking his friends and associates to vote for Member A. Through this process, Member A and Thompson became friendly.

After winning election, Member A offered to help Thompson open a gym, so Thompson could teach at-risk children how to box and stay out of trouble. To further that goal, Member A helped Thompson get space in a church on Columbia Road for the gym and worked to fund KDBYC through earmarks and pass-through payments that were administered by the CYITC and Collaborative.

According to Thompson, when KDBYC began receiving grant funds in 2004, Member A made several comments to Thompson [REDACTED]. During debriefings with law enforcement, Thompson informed the investigative team that he does not recall anyone else being present when Member A made those statements to Thompson.

From 2004 to 2009, Member A was responsible for steering $1.4 million to KDBYC.

During debriefings, Thompson told law enforcement that during those five years, Thompson paid Member A a total of $50,000 in kickbacks. Thompson's memory of the details of those kickback payments is not strong. Thompson cannot recall the specific dates, times, or years that the kickbacks were paid. Thompson also cannot recall the locations where the payments were made. The most Thompson has been able to convey to law enforcement is that the kickbacks were all paid in cash and were given to Member A either at a restaurant in Washington, D.C. or at Member A's office.

Law enforcement went to great lengths to try to corroborate Thompson's statements. The primary difficulties were: 1) Thompson stated that nobody was ever present when he paid the kickbacks to Member A; 2) Thompson stated that all of the kickbacks were paid in cash; and 3) Thompson stated that he never told anyone that he was paying kickbacks to Member A, including his wife. As a result, KDBYC's bank records were of little help, and there were no witnesses to any of the alleged hand-to-hand transactions.

Thompson offered a few details with regard to the kickbacks that law enforcement attempted to corroborate to no avail. Indeed, several of the details offered by Thompson were ultimately contradicted by independent facts. The following are four examples of details offered by Thompson that either failed to advance the investigation or were contradicted by independent facts:

1. <u>Detail #1</u>:

    a. Thompson's statement: KDBYC's bank records provide evidence of the kickbacks because Thompson made large cash withdrawals (e.g., $1,000, $2,000 or $3,000) by writing checks to himself or cash after large grants were deposited into KDBYC's account. Thompson informed law enforcement that after withdrawing the cash, he delivered the cash to Member A as kickbacks.

    b. Investigation: KDBYC's bank records show large cash withdrawals after certain large grant deposits, but there are also numerous large grant deposits that are not followed by large cash withdrawals. In addition, Member A's bank records do not show any corresponding deposits into Member A's accounts at times when Thompson made the large withdraws from KDYBC's account. The fact that Thompson withdrew large amounts of cash on certain dates does not provide any evidence that he took those funds to Member A. Law enforcement was ultimately left to rely on Thompson's word that he took the cash to Member A.

2. <u>Detail #2</u>:

    a. Thompson's statement: The first time Thompson went to Member A's office to pay him a kickback sometime in either 2004 or 2005, one of Thompson's trainers, [WITNESS #2] accompanied Thompson on the trip. [REDACTED]

    b. Investigation: In an unrelated case, [WITNESS #2] was convicted [OF MURDER AND OTHER CHARGES]. He is serving time in a federal penitentiary [IN THE UNITED STATES]. FBI agents interviewed [WITNESS #2] at the [PENITENTIARY] in an attempt to corroborate Thompson's statements. During the interview, [WITNESS #2] provided the following denials:

        i) [WITNESS #2] denied attempting to deliver an envelope to Member A;

        ii) [WITNESS #2] denied ever meeting Person B under the circumstances described by Thompson; and

        iii) [WITNESS #2] denied being present at all on a trip with Thompson to Member A's office.

    During the interview, [WITNESS #2] informed FBI agents that although he had no information regarding his alleged meeting with Person B, he witnessed Thompson hand cash to Member A on several other occasions. However, [WITNESS #2's] claim on this point is contradicted by Thompson, who consistently told law enforcement during debriefings that he was always alone when he paid kickbacks to Member A, per Person B's instructions.

7

3. <u>Detail #3</u>:

   a. Thompson's statement: KDBYC received grant funds from CYITC and the Collaborative despite failing to comply with the grantors' reporting requirements. Thompson stated that Member A's staff intervened on several occasions on KDBYC's behalf when CYITC and the Collaborative threatened to cut off funding because of KDBYC's deficient reporting.

   b. Investigation: Law enforcement confirmed that KDBYC routinely failed to comply with the grantors' reporting requirements. Law enforcement also confirmed that members of Member A's staff intervened on occasion when CYITC or the Collaborative threatened to cut off funding. However, law enforcement was unable to connect the continued flow of grant funds to the kickback payments. In other words, there was no evidence (witnesses or documents) to establish that the reason why Member A's staff intervened on KDBYC's behalf was because of kickback payments made by Thompson to Member A.

4. <u>Detail #4</u>:

   a. Thompson's statement: One of the kickback payments took place in September 2007 shortly before a charity boxing event for a 13 year-old boy who participated in KDBYC's program and was murdered earlier that year. **[REDACTED]**. Thompson stated that he gave Member A a kickback during this time frame, which Thompson believed Member A planned to use to fund Member A's international flight.

   b. Investigation: Law enforcement collected Member A's flight records, which show that Member A left the United States **[ON AN INTERNATIONAL FLIGHT IN 2007]**, returning to the United States **[LATER THAT SAME YEAR]**. Thus, it appears that Member A was out of the country during the time frame Thompson believes he met with Member A and paid Member A a kickback.

### III. Thompson's Potential Proactive Cooperation

When Thompson informed law enforcement in January 2013 that he had paid kickbacks to Member A through Person B, law enforcement investigated his claim regarding Person B. Among other things, Thompson offered to engage in consensually recording meetings with Person B for the reasons discussed above. Several factors caused law enforcement to reject Thompson's offer, including the fact that Thompson reversed himself several times with regard to Person B's role in the kickback scheme. Initially, in February 2013, Thompson informed law enforcement that Person B facilitated the kickback payments by instructing Thompson to pay Member A in cash and meet with Member A alone. On June 3, 2013, during a subsequent debriefing, Thomson disavowed his earlier account, stating that Person B played no role in the kickback scheme and did not provide instructions to Thompson on how to pay the kickbacks to Member A. Thompson added that he did not intend to get anyone else in trouble by cooperating, including Person B. The debriefing concluded at that point, so law enforcement could assess Thompson's credibility and determine whether Thompson could be used proactively. On June 6, 2013, law enforcement met with Thompson again to discuss Person B's role in the kickback payments, if any. During this debriefing, Thompson reverted to his earlier statements from February 2013, claiming that Person B did instruct him to pay the kickbacks in cash and to meet with Member A alone.

Thompson's inconsistencies with regard to Person B's role in the kickback scheme coupled with law enforcement's inability to corroborate Thompson's claims that he paid kickbacks to Member A caused law enforcement to decline to use Thompson in any proactive investigation. The Government concluded that it needed more evidence and corroboration before attempting to record the conversations of a sitting Councilmember or that Councilmember's Chief of Staff.

On June 26, 2013, Thompson pled guilty to one count of wire fraud before this Court. In the days that followed, several news articles appeared about the case, including a piece written by Colby King ("King") in the Washington Post. In King's article, he provided several non-public details that bore a striking resemblance to information Thompson provided to law enforcement. The key excerpt from King's article is as follows:

> Word is Thompson will finger a D.C. elected official who reportedly has taken kickbacks for helping Thompson secure grants intended for his business, Keely's District Boxing and Youth Center.
>
> That, of course, would be a serious allegation — and one that Machen would not allow Thompson to make lightly.
>
> The agreement Machen offered — which Thompson's attorney, Troy Poole, acknowledged — contains this provision: "Your client understands that if he falsely implicates a person in the commission of a crime, or exaggerates the involvement of any person in the commission of a crime in order to appear to cooperate, or if he falsely minimizes the involvement of any person in the commission of a crime in order to protect that person, your client will be in violation of this agreement."
>
> In other words: There will be hell to pay if Thompson lies.
>
> Now, consider this scenario: A kickback payment from a grant recipient in the amount of several thousand dollars is delivered to a D.C. elected official by two acquaintances of the grantee. The elected official, however, refuses to accept the delivery. So the grantee personally delivers the payment to the elected official —

10

> and has arranged for the transaction to be secretly witnessed by two friends.
>
> That's hypothetical. Maybe. But sometimes you can't make this stuff up.

Law enforcement met with Thompson after the Washington Post article was published to ask Thompson whether he had provided information to the Washington Post and to determine whether there was anything else Thompson could do to assist law enforcement. During the debriefing, Thompson agreed that the information contained in King's article was strikingly similar to the information he provided to law enforcement. When asked whether Thompson was the source for the Washington Post, Thompson became upset, denied speaking to the Washington Post, and accused the agents of being the leak.

Law enforcement pressed Thompson on this point to make sure he had not disclosed information to the Washington Post. Thompson responded that he had never lied to law enforcement. Law enforcement reminded Thompson that he had withheld information and minimized his role in the use of grant funds for gambling for a significant period of time, so it was not the case that he had always been truthful with law enforcement. At that point, Thompson became combative and ended the meeting. Law enforcement has had no other meetings with Thompson.

## IV. Government's Basis for Declining to File a 5K1.1 Motion

Thompson's cooperation with the Government is based entirely on the information he provided with regard to the kickbacks he stated he made to Member A. As discussed above, in August 2010, Thompson initially denied making any improper payments to Member A. After he disclosed the alleged improper payments, Thompson provided inconsistent statements concerning the involvement of Person B in the payments. And, most importantly, the Government has been unable to substantiate his claims. As a result, the Departure Committee concluded that Thompson's cooperation did not substantially assist in the investigation or prosecution of another person.

The Government also considered Thompson's delay in cooperating with the Government as a factor in its substantial assistance analysis. See U.S.S.G. § 5K1.1(a)(5) (indicating that the Court can consider "the timeliness of the defendant's assistance" when determining the appropriate reduction after the Government files a 5K1.1. motion). Thompson first admitted to misusing KDBYC grant funds in August 2010. Had Thompson accepted responsibility at, or around, that time and informed law enforcement about the alleged kickback payments to Member A, both law enforcement and Thompson would have been in a much better position to properly investigate the matter. Thompson's memory of the events would likely have been much clearer, and the Government would have been in a much better position to collect corroborative documents and statements. Instead, after originally denying making any improper payments, Thompson waited almost 2 ½ years before debriefing with law enforcement in January 2013 and informing law enforcement about the alleged kickback payments.

Another factor in the Government's assessment of Thompson was the fact that Thompson denied paying kickbacks to Member A when he was first interviewed by agents in August 2010. It was only after Thompson and his wife were indicted in November 2012 that Thompson for the first time mentioned anything to law enforcement about paying kickbacks to Member A. While these circumstances did not cause the Government to wholly discount Thompson's statements to law enforcement, his prior inconsistent statement was one of the factors that was considered in the Government's substantial assistance analysis.

## CONCLUSION

For the reasons stated herein, the Government respectfully submits this Addendum to the Court to fully apprise the Court of extent and nature of Thompson's cooperation.

Respectfully submitted,

RONALD C. MACHEN, JR.
UNITED STATES ATTORNEY
D.C. BAR # 447889

By: _____
SETH B. WAXMAN
ASSISTANT UNITED STATES ATTORNEY
New York Bar #: 4324638
555 Fourth Street, N.W., Room 5235
Washington, D.C. 20530
(202) 252-7234